UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NATALIE WALLNER, et al.,

     Plaintiffs,

vs.                              Case No. 8:10-cv-2039-JDW-EAJ

MHV SONICS, INC., et al.,

     Defendants.

_____/

## ORDER

BEFORE THE COURT is Defendants' motion for summary judgment (Dkt. 26), to which

Plaintiffs have responded in opposition (Dkt. 34). Also before the Court is Plaintiff's motion to

substitute parties (Dkt. 36), to which Defendants have responded in opposition (Dkt. 38). Upon

consideration, the motion to substitute parties (Dkt. 36) is GRANTED, and the motion for summary

judgment (Dkt. 26) is GRANTED *in part*, with respect to Plaintiffs' claims under the Americans

with Disabilities Act ("ADA"). Plaintiffs' remaining claims are remanded to state court.

### Background

Plaintiffs Wallner, Wayt, Rogers, and Kemp are former employees of a Sonic drive-in

restaurant in Winter Haven, Florida which had experienced several late-night robberies. Although

four or five separate robberies occurred, Plaintiffs were present during only two of the incidents. The

first of those incidents took place at approximately 1:30 a.m. on May 9, 2009 after Wallner and

Rogers had closed the restaurant and were preparing to leave the premises. An individual with a

handgun directed Wallner to return to the restaurant and remove the money from the safe. She

complied, and the robber left. No one was injured.

The second incident occurred on June 20, 2009 when Wallner and Kemp were working the

late night shift. This time, two armed gunmen entered the restaurant. They ordered Kemp to get on his knees and directed Wallner to open the safe. Wallner struggled to unlock the safe but eventually was successful. Wallner testified that one of the robbers cocked his gun, aimed it at her head, and said "Too late, bitch, you're dead anyway, you took too long." (Dkt. 30, Wallner Dep. at 124-25). Then they departed without harming anyone.

None of the Plaintiffs were present when the other robberies occurred, and it appears that Plaintiff Wayt was never at the restaurant during a robbery.

After the June 20, 2009 robbery, Wallner contacted Sonic's Employee Assistance Program crisis hotline. Based on the recommendation of the operator who took her call, Wallner drafted a letter, which stated:

> We here at Sonic Drive-in in Winter Haven, have been robbed over 4 times in a years' worth of time. This letter is to show proof that we are afraid for our lives, and do not feel that the measures of security taken are going to keep us safe. . . . By signing this letter we are saying that while at work, we are afraid for our lives, and are working in fear that we may be the next victim of a robbery. We are writing this and signing this in hopes that someone may listen to us, and help us have a safe place to work. Please hear our cry.

(Dkt. 33-1, Kemp Dep. Ex. 9). Plaintiffs and several other employees signed the letter and submitted it to Defendants.

Shortly thereafter, the employment of each Plaintiff ended. According to the manager of the restaurant, Defendant Nighswonger, each Plaintiff resigned. Plaintiffs, however, testified that they were fired because they were afraid that their lives would be put in danger by future robberies.

Rogers testified:

> Q. All right. How did it come about that you were told that you were fired?
>
> A. . . . Mr. Nighswonger had called me, or called my name, and he

goes, Shaun, did you sign that paper yesterday. I said yes. He goes, well, we no longer need you, you can go.

Q. And what paper was he referring to? Did you know?

A. I was assuming it was the one that [Wallner] had typed up.

(Dkt. 32, Rogers Dep. at 79).

Wallner testified:

A. I was asked if I was afraid for my life at work. When I said yes, I was told I was fired and I wasn't needed.
. . .

Then I -- then I asked again. Of course, I'm afraid. I -- who wouldn't be afraid? And again he asked me, "Are you afraid for your life at work?" "Yes, I am." "You're fired, I don't need you anymore."

(Wallner Dep. at 157).

Wayt's account of her termination was virtually identical to Wallner's:

Q. What happened?

A. We walked in. [Nighswonger] asked us if we had a [petition], or something like that, being signed. We said yes. He said, do you fear for your life, working here? We responded, yes. And he asked the same question again, do you fear for your life, working here? Yes. And he told us we were fired. He said, you're fired, I don't need you, get out of here.

(Dkt. 31, Wayt Dep. at 60).

Kemp testified:

A. I gave a written statement to Jamie, the manager, the next day [after the June 20 robbery].
. . .

Basically, it stated that I was scared for my life, but I didn't -- that was kind of very hard for me, and I needed a couple of days to kind of calm down a little bit. And I will be returning to work, no, I do not -- I didn't quit, just needed a few days to gather my composure.
. . .

3

Q. And did you ever go back to work?

A. Yes. I went to go check the schedule [two days later]. That's when I found out Mr. Nighswonger had replaced me.

(Dkt. 33, Kemp Dep. at 47-50).

Plaintiffs then commenced this action in state court, alleging claims for negligent training, supervision, and retention, and for negligent failure to provide a safe work premises. After receiving notices of the right to sue from the Equal Employment Opportunity Commission, Plaintiffs amended their complaint to add a claim that they were terminated in violation of the ADA because Defendants regarded them as disabled. Based on the federal question presented in Plaintiffs' ADA claim, Defendants removed this action to federal court. They now seek summary judgment, arguing that Plaintiffs have not established that they were regarded as disabled within the meaning of the ADA.

## The proper parties

Before addressing the merits of Defendants' motion for summary judgment, it is important to clarify the proper parties to this action. Plaintiffs commenced this action against Glen Nighswonger, Dane Martin, MHV Sonics, Inc., SDI of Winter Haven, LLC, and McClain Sonics, Inc. Nighswonger was the manager who terminated Plaintiffs. Martin was Regional Vice President of Operations for a large group of Sonic restaurants, including the Winter Haven restaurant. MHV Sonics, Inc., SDI of Winter Haven, LLC, and McClain Sonics, Inc. were alleged to be the employers of Plaintiffs, Nighswonger, and Martin.

The undisputed evidence shows that Defendant SDI of Winter Haven, LLC was the employer of Nighswonger and each of the Plaintiffs. The evidence further shows that Martin's employer was McClain, McClain, McClain, Inc., which is not a party to this action. Plaintiffs request that McClain, McClain, McClain, Inc. be substituted for McClain Sonics, Inc. Based on the conflicting testimony

4

given by Martin, which was subsequently clarified by another witness after the close of discovery, Plaintiffs have shown good cause for amending the case management and scheduling order to allow the substitution of McClain, McClain, McClain, Inc. for McClain Sonics, Inc. As for the third entity, Defendants argue, and Plaintiffs concede, that MHV Sonics, Inc. is not a proper party and should be dismissed from this action.

## Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. Northern Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

All justifiable inferences and all reasonable doubts about the facts should be resolved in favor of the nonmoving party. *Hickson Corp.*, 357 F.3d at 1260. The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). "Instead, the court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party." *Id.*

## Discussion

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009). A "disability" within the meaning of the

5

ADA includes:

> (A) a physical or mental impairment that substantially limits one or
> more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in
> paragraph (3)).

42 U.S.C. § 12102(1) (2009).[1]

Plaintiffs do not allege that they actually had physical or mental impairments. Nor do they

argue that there was a record of such impairments. Their claim is simply that Defendants regarded

them as disabled because they feared for their safety at work.[2]

Paragraph 3 of § 12102 sets forth certain requirements for establishing a claim that one is

regarded as having an impairment. It provides:

> For purposes of paragraph (1)(C):
>
> (A) An individual meets the requirement of "being regarded as having
> such an impairment" if the individual establishes that he or she has
> been subjected to an action prohibited under this chapter because of
> an actual or perceived physical or mental impairment whether or not
> the impairment limits or is perceived to limit a major life activity.
>
> (B) Paragraph (1)(C) shall not apply to impairments that are transitory
> and minor. A transitory impairment is an impairment with an actual
> or expected duration of 6 months or less.

---

[1] The parties agree that the ADA Amendments Act, which became effective January 1, 2009, applies because Plaintiffs' employment ended on or about June 24, 2009.

[2] The parties failed to address the seemingly obvious question of whether a reasonable concern for one's safety at work constitutes a "mental or physical impairment" protected by the ADA. The E.E.O.C. regulations define a "mental impairment" as "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). Fear for one's safety in the workplace, to the extent it is not the product of a mental or psychological disorder, arguably does not satisfy this definition. *Cf. Shah v. Upjohn Co.*, 922 F. Supp. 15, 27 (W.D. Mich. 1995) ("Fear of cancer does not qualify as a disability."), *aff'd*, 107 F.3d 871 (6th Cir. 1997); *Anderson v. North Dakota State Hosp.*, 232 F.3d 634, 636-37 (8th Cir. 2000) (plaintiff's fear of snakes was neither an actual disability nor perceived as a disability). Notwithstanding, because the parties did not address this issue, and Plaintiffs' ADA claim nonetheless fails, it will be assumed for summary judgment purposes that Plaintiffs' fear is, in fact, a mental impairment.

42 U.S.C. § 12102(3) (2009).

In determining whether Plaintiffs were regarded as having an impairment which was transitory and minor, the inquiry is necessarily limited to the "perceived impairment on which the employer's action was based . . . ." 29 C.F.R. Pt. 1630, App., § 1630.2(*l*). Whether Plaintiffs suffered from other impairments is not material, so long those other impairments did not form the basis of Defendants' actions.[3] Plaintiffs only contend that they were terminated because Defendants perceived their fear as an impairment. (Dkt. 34, Pl.'s Response at 15-16; Wallner Dep. at 157; Wayt Dep. at 107-08, 137; Rogers Dep. at 106; Kemp Dep. at 96). They do not contend that Defendants perceived their fear as a symptom of a mental or psychological disorder or that they were fired based on any other perceived impairments.

The thrust of Defendants' motion is that Plaintiffs' perceived impairment, the fear that their lives would be in danger due to future workplace robberies, was transitory and minor. Plaintiffs made no effort to address Defendants' argument.[4] Nor have they pointed to any evidence demonstrating that they had impairments which were more than transitory and minor.[5]

---

[3] There is evidence, for example, that Wallner suffered from paranoia, anxiety, insomnia, and post-traumatic stress disorder after the robberies. (Wallner Dep. at 27-30, 146-47). Similarly, there is evidence that Kemp has since suffered from stress, deep depression, and anxiety. (Kemp Dep. at 90). But Plaintiffs have not pointed to any evidence demonstrating that Nighswonger knew about these conditions or had any reason to believe they existed, much less that these conditions were the reason for Wallner or Kemp's termination. Indeed, many of these conditions appear to have arisen after Wallner and Kemp's employment ended. Kemp did make Defendants aware that on the night of the robberies, he was unable to sleep and was scared to take a shower or close his eyes. (Kemp. Dep. Ex. 7). But Plaintiffs have not identified any evidence showing that he was fired because of this or that Defendants perceived this to be symptomatic of a mental or psychological disorder. Nor have Plaintiffs made such an argument. While Wallner and Kemp's conditions are not taken lightly, Plaintiffs simply do not contend that any of these conditions constituted impairments at all, much less impairments that formed the basis for their firing.

[4] Plaintiffs' response focuses primarily on whether an adverse employment action occurred. The Court agrees with Plaintiffs that there is sufficient evidence from which a jury could conclude that each Plaintiff was terminated, and therefore, it is assumed for purposes of summary judgment that Plaintiffs were terminated.

[5] It is not enough that Plaintiffs incorporated every deposition into their response by reference. (*See* Pl.'s Response at 2). Under Rule 56, a party opposing summary judgment is obligated either to "cit[e] to particular parts of materials in the record" showing a genuine fact issue or to demonstrate that the materials cited by the opposing party fail

The determination of "transitory and minor" is made objectively. 29 C.F.R. § 1630.15(f)(2). That is, "[t]he relevant inquiry is whether the actual or perceived impairment on which the employer's action was based is objectively 'transitory and minor,' not whether the employer claims it subjectively believed the impairment was transitory and minor." 29 C.F.R. Pt. 1630, App., § 1630.2(*l*) (providing examples and indicating that neither bipolar disorder nor HIV infection is transitory and minor).

A transitory impairment is one with an "actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B) (2009). The parties have not identified any record evidence which objectively shows that, at the time of Plaintiffs' termination, their fear could reasonably be expected to last longer than six months.[6] Rather, Plaintiffs' fear that their lives would be at risk in a future robbery was induced by specific events that may or may not have recurred. *See Seibert v. Lutron Elecs.*, 408 F. App'x 605, 608 (3d Cir. 2010). While Plaintiffs' fear was certainly understandable, it was "a transitory phenomenon that [could] be expected to disappear when the . . . 'stressor' is removed." *Adams v. Alderson*, 723 F. Supp. 1531, 1531 (D.D.C. 1989), *aff'd sub nom.*, 1990 WL 45737 (D.C. Cir. Apr. 10, 1990).

Although Plaintiffs' concern for their safety is not taken lightly, to the extent it constituted an impairment, that impairment was at most minor. While Plaintiffs contend that they feared for their lives due to possible future robberies, all returned to work. Indeed, Plaintiffs have not pointed to any evidence showing that they were unable to go to work or to perform their jobs due to their fear in the

---

to show the absence of a disputed issue of fact. Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

[6] To be sure, Kemp's letter initially noted that "this will [probably] remain a problem for me. Never had anything like this happen to me." (Kemp Dep. Ex. 7). Yet, in his testimony, Kemp summarized his letter as stating that "I needed a couple of days to kind of calm down a little bit. And I will be returning to work . . . . just needed a few days to gather my composure." (Kemp Dep. at 48). And, just three days later, Kemp was "set to go back to work" and went in to check the work schedule. (Kemp. Dep. at 49).

workplace. Rather, as Defendants persuasively argue, the evidence simply shows that Plaintiffs were unwilling, and in some cases refused, to work certain shifts. In short, Plaintiffs' fear did not prevent them from working at the Sonic restaurant. They simply did not want to work at night.

What Plaintiffs really were seeking was a reasonable accommodation for their perceived impairment, that is, to be transferred to the day shift. Whether this accommodation was reasonable or not, Defendants had no duty to provide it. The ADA Amendments Act makes clear that employers "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section." 42 U.S.C. § 12201(h) (2009). Accordingly, Defendants were not obligated to afford the accommodation of adjusting the work schedule so that Plaintiffs only worked during daytime hours.

Given the two robberies Plaintiffs experienced, and the other robberies that had taken place, Plaintiffs were understandably concerned that future robberies might occur and that, at some point, someone might be injured or killed. While this fear was not unreasonable, it was at most a transitory and minor impairment, assuming it was an impairment at all. Therefore, regardless of whether Defendants perceived them as having such an impairment, Plaintiffs were not disabled within the meaning of the ADA. *See* 42 U.S.C. § 12102(3) (2009). Based on Plaintiffs' version of the events, Defendants' unsympathetic response may have been inappropriate and unwarranted, but it did not violate the ADA. This is not to say that Plaintiffs have no remedy. Rather than wrongful termination on account of a perceived disability, Plaintiffs' claims may be more appropriately pursued in the negligence-based causes of action they have filed under state law.

### Conclusion

Accordingly, it is ordered that

9

(1)     Plaintiffs' motion to substitute parties (Dkt. 36) is GRANTED. The clerk is directed to substitute McClain, McClain, McClain, Inc. for Defendant McClain Sonics, Inc. and to TERMINATE  McClain Sonics, Inc.

(2)     Plaintiffs' claims against Defendant MHV Sonics, Inc. are DISMISSED. The clerk is directed to TERMINATE MHV Sonics, Inc.

(3)     Defendants' motion for summary judgment (Dkt. 26) is GRANTED *in part*, to the extent that summary judgment is entered in favor of Defendants on Count III of Plaintiffs' amended complaint. The motion is denied without prejudice in all other respects.

(4)     Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining negligence claims and REMANDS this action to state court.

(5)     The clerk is directed to ENTER JUDGMENT in favor of Defendants on Count III of Plaintiffs' amended complaint, to send a certified copy of this order to the Circuit Court of the Tenth Judicial Circuit in and for Polk County, Florida, and to CLOSE this case.

DONE AND ORDERED this  4ᵗʰ  day of November, 2011.


**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record